May it please the Court, Mark Gross of the Pomeranz Firm. I'm here on behalf of the plaintiff's appellants who brought a securities fraud class action on behalf of investors in Chinacast Education Corporation for the period February 2011 through April of 2012. The facts in this case, unlike many that you've heard this morning, are clearly undisputed. The CEO of the company, Ron Chan, looted $120 million in cash and other assets from the corporation, thereby belying the balance sheet representations of assets as well as the adequacy of internal controls upon which the investors and the market relied. Upon revelation of this fraud, the stock price collapsed, investors lost millions of dollars. The court below dismissed this case without oral argument, and while it noted that there was a massive fraud, it found that one of the elements of the securities laws was not satisfied scienter. Ordinarily, the mindset and misconduct of a CEO is imputed to the corporation, just as an agent's actions is imputed to the principal. What happened here, though, was that the court applied what is known as the adverse interest rule, which said that to the extent that the actions were self-benefiting, arguably ultra-virus, that therefore his mindset and misconduct could not be imputed. In making that ruling, the court made a grievous error and ignored what we had argued in our papers and are set forth in the record at 268-69. There is a well-regarded, long-standing exception to this adverse interest rule. It is known in some circles as the apparent authority exception. We refer to it in our papers as the innocent third-party exception. Effectively, it holds that where a person reasonably relies upon the apparent authority of an agent, that the misconduct of the agent is therefore imputed to the corporation, in this case the CEO and the company. May I ask about the source of law? It seemed to be that the parties were arguing more or less common law agency issues. They are a Delaware corporation. Does it matter under Delaware law, and should there be a choice of law analysis, or can it proceed under basically common law analysis? Well, I believe that common law is appropriate. It's an interesting choice of law question which we hadn't addressed because this is not necessarily an internal affairs issue, which is Delaware law ordinarily. The company had a corporate presence, as I believe, in California, although it was located and principal business was in China. But it is essentially a common law that has been adopted by the courts with consistency through the ALI restatement of agency, through the Bartoni case in the Ninth Circuit, the Belmont case, which was a securities-related case in the Third Circuit, as well as in several securities fraud cases, Tyco, Piscala, Crazy Eddie. Tyco, as you may recall, Dennis Kowalski, looted the company, took out, had gold faucets in his bathroom. Nonetheless, that was not a bar to securities fraud claims against the company. So this is like a, in effect, an exception to the exception. Correct. And the district court stopped at number two. Correct, absolutely, and it entirely ignored and failed to address that issue. And indeed, the cases upon which it relied, for instance, Sendint and others, the courts there, and J.P. Morgan, the courts there would not present it with that exception. And those cases are district court cases in which we don't see whether this exception was presented or not. It just doesn't come up in those cases? Well, we know that it wasn't presented. Sendint and Rentway. Yeah, and in particular in Sendint, the court held that it wasn't even certain that the adverse interest applied because it wasn't clear whether or not this was fully in the interest of the individuals who perpetrated the fraud or the corporation. And I think that goes to the essential reason why it's important that this court make a bright line and follow the ALI and all the precedents saying that where there is reasonable reliance upon apparent authority, that the company should be held liable. There are very clear policy reasons. Now, before you get to the policy reasons, is it your position that there are no current Ninth Circuit cases that have adopted the apparent authority exception? No. Bartoni is the case which we cited, which we believe is quite consistent with the apparent authority exception to the adverse interest rule. It is brief. The facts there are a bit complicated. It had to do with Wells Fargo, so I won't go there. But definitely that case is on point, although it's not a straight securities court action. Can you cite any cases in our circuit that you believe are contrary to your position? In other words, that eschew the concept that apparent authority is an exception? Well, Your Honor, in the interest of full transparency, there was a decision rendered last Friday in the Northern District of California, Polycom. We happened to be the lead counsel in that case as well, or the lead victim as well. In fact, in that case, the court followed the reasoning in this case. But we don't have any Ninth Circuit law. No, no, you have no Ninth Circuit law that independently came to the conclusion that, no, we should not be applying the innocent third party exception to the adverse interest. And what about under the PSLRA, this agency exception exception? Is there a case that applies it in that context? Your Honor, I do exclusively securities court cases. I've been doing it for 40 years. I can't say that there is anything in the PSLRA that addresses this particular issue. Right, so maybe my question probably wasn't quite precise. But I'm asking whether once that PSLRA was passed, what circuit cases are there that then apply this apparent authority agency doctrine in the context of that statute? Well, the Belmont case is a 2003 case. No, 2013 case. 13, okay. And that certainly is post the time period, and certainly involves a securities type fraud investments in a hedge fund. Is that your best case, Belmont, from Third Circuit? I believe so, Your Honor. At court of appeals level. Yes, definitely. Other than, obviously, the opinion you will write here. If I may address the policy reason that I think should underpin your opinion, reversing here. It is that the corporation and its manager is the one who selects the officers to run the company. It is in the best position to police those individuals, and we want to create incentives for them to be vigilant in doing so. If I could quote from Belmont, this rule of liability is not based on any presumed authority in the agents to do the acts, but on the ground of public policy that the principal, who has placed the agent in the position of trust and confidence, should suffer rather than the innocent stranger. And it goes on, the imputation doctrine also advances public policy goals in that because it is a principal who has selected and delegated responsibilities to its agents, the doctrine creates incentives for the principal to do so carefully and responsibly. Let me ask you this. From a policy perspective, you don't need to convince me. I'm convinced. But, as I understand it, the certified public accountants raised a red flag before this theft occurred. Is that correct? I would say that is correct. What implication does that raise in this case? Well, I was thinking today that perhaps we shouldn't have let out the independent directors on the audit committee because they perhaps should have been on higher notice to make sure things would have been done better. It certainly puts the onus on the CFO here to have done more than what he was doing to make sure that this didn't happen. Because aren't they, as a practical matter, aren't the certified public accountants of these publicly traded companies, aren't they really the watchdogs to watch for this kind of error? And when they raise a flag, aren't the independent directors, the CFO, anybody that's not directly involved, should not they have picked up on this and done something about it? I certainly wouldn't disagree with you on that. I'm not quite sure what the implications of that is in this situation. If anything, it speaks to greater corporate responsibility having been ignored, and which goes to perhaps the point that Judge Posner made in the Centco case, that if anything, we want to incentivize greater diligence. And he said, and we did not cite this in our papers, but he said incentives to hire honest managers and monitor their behavior will be reduced unless you allow for this. I guess my question is a variation on that. We're basically on a motion to dismiss at this point is all. So I was trying to imagine what the summary judgment, for example, might look like, and what kind of factual issues, if this goes forward, if it's permitted to go forward because the allegation gets you to the playing field, what kind of factual issues could defeat this principle as a matter of law? It's an excellent question that I've been debating in my own mind as well. And the question I think we have to wrestle with, should it be a bright line test or should it be a balancing test? Should it be one where somewhere along the spectrum the looting misconduct gets so egregious that we will then not allow for third parties who have no way of understanding what's going on and who act in good faith nonetheless to be left without an opportunity to pursue claims? So that would be, even though they might be characterized as an innocent third party, somehow they still wouldn't have a claim because it was so outrageous. And we're saying that should not be the standard. And indeed, I believe the ALI made it very clear in its restatement on 504 adopted in 2006. And I'll just give you a shortcut version. For purposes of determining a principle's legal relation with a third party, notice of the fact that an agent knows or has reason to know is imputed to the principle, and this is the key point, when necessary to protect the rights of a third party who dealt with the principle in good faith. So the ALI wrestled with this. It deals a lot with the accountant issues. And in fact, there's obviously a lot of efforts to protect the accountants in these circumstances, and we can appreciate that, but this is not a claim by or for the accountants vis-à-vis the corporation. So here's the practical problem. Taking aside if you have some kind of notice so you aren't an innocent purchaser, and it's a third party, in which case one could dismiss such a case on summary judgment. But if we state the principle as you suggested, does that basically make the motion to dismiss into a de facto summary judgment because there's nothing that could defeat the claim? The question then becomes, I mean, this is a case that on its face clearly there was looting going on of such a magnitude that it ended up eviscerating all the corporate assets. This is the worst case scenario. There are other cases where there is a pilfering of the expense accounts and whether or not there's a question of integrity on the part of management. I think there are different scales that go on, and I've rarely been in a case where scienter once one gets into discovery isn't hotly disputed because there's a question of how much notice was given. As Your Honor points out, here there was notice of management control issues, and presumably there was only lip service being given to it. But on the other hand, we don't know exactly what those warning letters said. The short answer is you don't think that it would, in effect, always be an automatic summary judgment for the plaintiff. You would still have enough here scienter has pled, but that you'd still have a dogfight over that in many cases. Absolutely. They might allege that you were knowing purchasers because you had the warning of the accountants and blah, blah, blah. So there'd be a lot of things that could be raised. Well, that's an interesting point. If you're saying we brought this on an assumption of risk. What about Chinese law? Does Chinese law have any importance in this case? Admittedly, this was sold in the United States and all that sort of thing, but I'm not sure exactly what role, if any, Chinese law plays in this. What does it say about such a thing? Apparently it's quite common over there, so what's the deal? What we have learned is that the Chinese who started out as communists have adapted to capitalism extremely well, but a frontier version of capitalism, 1880 style, in which they have been very entrepreneurial with their business, but very unclear at best about their abidance of law. I cannot say in any sense what is supposed to be the law, much less the practical law on the ground. I don't know that there has been that much development in the courts, but I will say that you point to another issue here because the corporation here is seeking to pursue an action against the individuals who looted the company, and I believe that, is that in China, that the case has been filed? That is correct. Yeah, so I would ask, maybe you could defer the counsel. You're well over the time anyway. Oh, I'm sorry. But if I might just say, that points to one other reason why. No, you may not. The time is over. Okay, I'm sorry. Thank you for the indulgence. This is not a criminal case. Sit down. Thank you, Your Honor. May it please the Court, Israel David, on behalf of the appellees. Appellants are asking the Court to adopt an innocent actor exception that would erase several decades of jurisprudence in the securities fraud litigation context. The adverse interest exception is well recognized in courts, and if the Court were to recognize an innocent third-party exception to that exception, there will never be another securities case in which the adverse interest exception would apply. And the reason for that is because in securities cases, the plaintiffs will always be innocent. The plaintiffs in this case are innocent, and that will always be the case in every securities fraud class action. We just have a lot of folks who bought stocks. Let's say that happens. Given equity in this, why is that bad? I mean, realistically, if you've got people who are out there buying securities, we want to have an honest exchange. We want people to have disclosure and so on. And if you have this case is particularly bad, but you have a situation where apparently I've taken the facts as pled. They innocently buy. The CEO runs off a lot of money, distributes the assets to some friends. Basically, the company is totally looted. As between what's left of a company that, in an apparent authority analogy, at least permitted it possible, it clothed the emperor, if you will, why shouldn't that entity, as a matter of law, bear the responsibility as opposed to the innocent investor? I mean, it's no different than you learned in law school, and I did. You know about the hotel. You go in there, and the guy is at the front desk, and he looks like a hotel employee, and you give him the keys, and you give him the keys to your car, and he takes your car, and he takes the stuff out of the safe, and he's gone. The hotel's liable. What's different about this except the magnitude? I think the answer to that is that this is an action under the Securities Exchange Act of 1934, and that's where the liability has to emanate from. Under the 1934 Act, for there to be liability under 10b-5, there needs to have been fraud. Because a company does not act itself, it's just a metaphysical item. But the company acts through its agents. Exactly. Through its agents, and in this case, if it set it up or it made it possible for the fraud to occur, why should it not, just like in this simple hotel example I gave you, why should it not bear the burden as opposed to the innocent third party? I think the answer to that is because for someone to be liable or an entity to be liable, there has to be scienter. But that's where the whole argument is. You're imputing it. Exactly. Because a company cannot have a state of mind, so we impute, and it's a longstanding rule of imputation, so we impute the scienter of the senior most offices or other agents to the company. And only in the narrowest of exceptions is there an exception to the rule of imputation. So generally, there's a rule of imputation that will almost always be applied. In the narrowest of exceptions, where the senior most offices of the company go completely against all of the company's interests, and that's what you have here. You have the most egregious of cases. They didn't steal from the company. They stole the company. That's the complaint. They stole the colleges. They stole virtually all of the cash. It's the narrowest of exceptions. You've asked about other Ninth Circuit cases. But could you just stop right there? In the context of a principle, what is the narrowest exception? We have a parent authority, and you said that that's well accepted in agency law. And then you said, but it's the narrowest of an exception to that. That's right. How do you define that narrowest of exceptions? That would be where it will always be a case of extreme looting. You have the Hewlett-Packard case. We don't cite in our brief because it came down to the Northern District of California shortly after we filed our brief. It's Judge Tigger, and it's a securities litigation. And he describes the adverse interest exception as the narrowest of exceptions. Why would you be concerned? If we adopt that and we describe this as the narrowest of exceptions where truly the company is just looted, what's the problem there? I get your point that if every securities claim is going to allege this, you've got a little bit of a problem. But hopefully opinions can be drafted narrowly enough so that the exception can be recognized. But what I gather was intended to be as a matter of policy. You just can't. Isn't the garden variety deal, it's not the normal situation. It's whole-scale looting of things like this. It's just a massive fraud against the investors. Well, you're right. What we're saying is that the adverse interest exception is the most narrow of exceptions. It will rarely ever be applied. What we're saying is there is no innocent actor exception. We're aware of only two securities cases which have recognized an innocent actor exception. And that's Tyco and Pascala. We do not think Belmont is an innocent actor exception case. We think quite the contrary. We think the Third Circuit of Belmont supports entirely our position. In Belmont, and it's 708F3rd, and the case is at page 470. And we think what's relevant here is at page 496, and it carries over to 497. The court struggles, the Third Circuit struggles to find a benefit to the corporation to which the scienter is going to be attached. And only after the court finds that the corporation to whom the scienter of the wrongdoer is going to be imputed, only after finding that actual benefit does the court find imputation. Counsel, with respect, we are, as you know, an independent court of appeal. We look at the reasoning of other courts of appeal. We're not bound by what they do. I'm talking about the policy issues here. You're talking about in what way the corporation benefits. Frankly, if the corporation makes this possible by its carelessness, by whatever, it should bear the burden, not the innocent purchaser. And my understanding and reading of the underlying theory behind this is not whether it benefits the corporation. The question is whether the normal regime, which you have to have with a big corporate entity, should apply when you have a situation like this. So I'm not concerned about the benefit to the corporation. I don't really think that cuts much of anything. That's right, Your Honor. And in terms of policy, in our view, the reason why there is no accepted other than two district court cases, which go against the weight of district court cases that find adverse exception, what we're saying is a matter of policy. The reason why there are no courts with two exceptions in district courts, why there are no courts that have an innocent actor exception is because I would agree to the extent that if we weren't interpreting the 1934 Act, the Securities Exchange Act of 1934. But the 1934 Act does not do and does not have a policy of splitting the risk as between one victim and another victim. How can you say that? Such a thing exists in Asian... Well, that's ridiculous. Of course it does. There are all kinds of cases that split things back and forth. 10b-5 was developed in that very way. Now, you've got a recent decision on insider trading. Courts do that all the time, interpreting these laws. Now, I admit that that's a different act, but the reality is even though this is the Securities Exchange Act of 1934 or even the Securities Act of 1933, a lot of this is, even though it's a statute, is left to, if you will, common law development of the meaning of the terms by the courts of appeal in the Supreme Court of Courts. And in this situation, I don't see what is so violative of the 1934 Act in a situation where, let's say your mother's the purchaser of this, and you've got their whole life savings in the whole thing. How would you feel about it then? Do you think that the corporation ought to be protected? It would be horrible, but there are other means of relief. The 1934 Act is not complete insurance. It's not the FDIC. Folks could sue Mr. Chan and Mr. Sen and China. The company's done that. There's no reason why plaintiffs can't do that. Some other shareholders privately have sued the auditors, and Your Honor raised that issue. We don't know. I'm not advocating such a lawsuit, but we don't know why they haven't pursued that. So there are other avenues. Alternate avenues doesn't really answer the question. My concern is in the general construct of agency law where you generally have an out if someone's acting adverse to the corporation, that's only part of agency law, particularly if you look at the restatement. So why wouldn't we look at the whole construct of agency law to figure out how to analyze this? I think the answer to that lies in Justice Breyer's decision in Inouye Atlantic Financial Management. That's a case that's cited by plaintiffs. That case was the first, well, it wasn't the first case, but it's one of the seminal cases that ruled once and for all, and at the time it was contrary to Ninth Circuit law, that Section 28, that's the control provision section of the 34 Act, that 28 is not the exclusive vicarious liability section, but as well we should also apply some facets of agency law to securities law. But Justice Breyer warns in that case that, and this is the key, he says, however, and he says, the extent to which a federal statute such as the Securities Act embraces common law agency principles depends, as the Supreme Court stressed in the antitrust context, probably referring to mechanical engineers, upon the extent to which their adoption is consistent with the statute's language and furthers its purposes. Both. And in this case, as I understand, both 33 and the 34 Act, this would be wholly consistent with that. This is the very kind of situation where the folks who adopted this were, they were concerned that these people who purchased, in good faith, let's assume like most people, unlike most people, they actually read the prospectus. It's all there. But it turned out that the folks who were in control lied, cheated, and made a massive fraud. Now, again, it had to be very carefully tailored. I get that. I get Justice Breyer's point. But this is wholly consistent with the underlying reasons for the Act, and as you yourself cited and as my colleague cited, the restatement third of agency clearly backs this. Don't you agree? I agree that the third restatement would back this, but only if it's applied to securities laws, and that certainly hasn't been done yet in any accepted fashion. Look at mechanical engineers. Let me ask you about mechanical engineers because it's an antitrust case, correct? Exactly, yes. Okay, it's an antitrust case in which they're talking about agency action, but then it cites a securities case, does it not? It does cite several securities cases for the point that some aspects of agency law are transported to fill in missing gaps in the securities laws. But look at mechanical engineers. Okay, so look at the case, the railroad case cited in mechanical engineers cites the Gleason case, and then the Gleason case is this railroad where you had a bad apple, but they impute in effect to the corporation. So when I see Justice Breyer's cautionary note, which is understandable, but then I see the citation to the securities law or securities cases, what do you make of that? Well, I think mechanical engineers is the best example. It's a half century after the antitrust laws are established, and a divided court struggles heavily with whether and to what extent to accept the agency principles and the apparent authority. And in mechanical engineers, the Supreme Court really had a very difficult time with that organization, and you see it page after page. They allowed a situation in which one person who's on a subcommittee of the mechanical engineer society allows that person to put out something informatory of the entire organization that hurts a new competitor who is making a boiler and to put that person out of business because he worked for a competing boiler. The Supreme Court really struggled with a not so innocent society that allowed something like that to happen. But the court, even a half a century after the introduction of the antitrust laws, really had to struggle page after page to really get comfortable even looking at the legislative intent. Okay, so let's say that we do that. What if we struggle and then maybe we'll give it to them and they could struggle and we'll get some fractured opinion that we'll try to figure out? But the fact that that came up some number of years after the passage of the primary antitrust law doesn't seem, the Sherman Act doesn't seem to me to counsel one way or the other. Now we're kind of, like it or not, we have this in front of us. So they're looking in the context of the antitrust laws, and of course the antitrust laws are not to protect competitors but to look for consumers, et cetera. Here, what purpose of the securities law do you think would be frustrated by the principle advocated by your opposing counsel? Well, two points on that. One is, as Judge Smith mentioned, is the 33 Act and the 34 Act. The 33 Act has strict liability. It doesn't require scientific cases under sections 11 and section 12. The 34 Act does. So we need to have a defendant with scienter. Correct. And we will impute. But there's the narrowest of exceptions, as Judge Tigger said most recently up in the Northern District here in California, the most narrowest exceptions is the adverse interest rule. So it would frustrate both the fact that we need scienter and we will impute it, but we should not impute it against a victim. Chinacast as a corporation was a victim. I'm not saying it's a bigger victim. I'm saying it's an equal victim. Chinacast is decimated by the bad acts of its senior most officers. But if Chinacast, I mean, Chinacast isn't just the principle, correct? The corporation has other live bodies that are supposed to be mined in the store, right? Well, yes and no. I mean, a corporation is two things. It's the people that run it. That's the board of directors. That's the board of directors. And it's the shareholders. So it's a metaphysical creation. Let's talk about the others. There's actually three people. Well, there's the board of directors from a legal standpoint. There's the shareholders who hold the equity interest. And then there's the people who work at the company that run the company at the behest of the board of directors. And if you have a situation where you have a huge bad apple, a total fraudster, as alleged here, and you have literally willful blindness on the part of other people who are part of the execution of the corporation's duties, you're basically saying, well, too bad. You let the corporation off because the real bad actor is simply the fraudster. Would that be your position? No. Anyone who engages in fraud at the company needs to be pursued. The company should pursue those people. Law authorities such as the police, as we have in this case in China. We brought the police in to go after the bad actors. And the shareholders. So the shareholders could and should go after the bad people. But as between the company and the shareholders, admittedly, both of them have been terribly damaged here. I get that. But since it was the company and the way it was run that made this even possible, isn't there, relatively speaking, more culpability on the part of the company than certainly the shareholders? I mean, that's what a parent authority does in a way. It just says, look, you know, we're really sorry. Everybody got screwed here. But the one who made it possible is the one that's going to bear the burden. And you talk of this. This is a very narrow exception. To satisfy this case, it doesn't have to be broken wide open so that in every class action involving huge frauds and so on, that this could be cited. It can be very, very narrow because this is the facts of this case are so bad. So for your company, as well as for the shareholders, that it really would fit into a very narrow exception. Right. I mean, I would say the company didn't have cyanide. So unless it's imputed to it. And that's the whole point. And it is imputed. But there's a very well regarded, very narrow exception to that imputation. And that's the adverse interest rule, which will be eviscerated. I'm sorry. If this court adopted Pellin's request, there will never again be an adverse interest rule in securities laws. And that's been around for quite a while, recognized by a number of courts, including the Fifth Circuit. And we cite that.  So you're saying if we were to adopt the position by the appellants here that we should put a little rip, a gravestone on top of the opinion vis-a-vis the adverse interest rule, right? Correct. Okay, perfect. Do you have the cases cited by the district court? I think Stendant, maybe. There were a couple of cases cited by the district court that were district court cases. Did those cases actually address this issue? No. So in other words, they don't really help us, one way or the other. With one exception. All right. Because there are approximately 10 district court cases plus a Fifth Circuit case that recognize the adverse interest rule, by their not discussing it, it's really a rejection for this reason. In every case, in all of those cases, it jumps out of the page. They're just plaintiffs, shareholders bringing lawsuits. They are innocent. That's something that I agree with counsel. The plaintiffs here are innocent. And in all of those cases, they're innocent. It jumps out of the pages. And yet, none of those cases mention the innocent act of exception. I don't know. That would be a pretty amazing jump if we say, well, just because they didn't mention it, it therefore must have been rejected. I mean, because I don't know the circumstance. You don't necessarily know all the circumstances. Yes, there's innocence, but then, as you've pointed out, or at least as he suggested, there's different ways to apply whether you call it the innocence exception or some other characterization. How do we know that that was argued? No, we don't know that it's argued, but we know that it's apparent just from jumps out of the complaint and the decision that they are innocent, and yet there's an adverse interest exception being applied. It's two cases. There's Tyco and Pascala, the Crazy Eddie case where they talk about the innocent third party. That's in the common law section where the auditors sued Crazy Eddie. Pete Barwick sued Crazy Eddie. May I ask you a question? Is the adverse interest rule so well established that we must accept it? No. I urge the court to continue to recognize it, but the court's not bound by the Fifth Circuit. It's not bound by the Third Circuit, which recognized it. There's certainly no contrary Supreme Court decision, and it would be new for the Ninth Circuit because Bartoni does not at all address this. It's not an apparent authority case. It actually says that it's implied actual authority. The person who wrongfully deposited checks into Wells Fargo, it was the sole shareholder's daughter. The sole shareholder, Mr. Bartoni, was there, and the court said it's actual authority. Is there any alternate pleading here on actual authority? I'm sorry? Is there any alternate pleading here in the complaint on actual versus apparent authority? I don't think so. I don't think so. What the plaintiffs are saying is that the CEO and the CFO of the company had apparent authority to make statements, but they went ahead and made false statements. Thank you. Your Honor, thank you very much. One minute? Yes. You have two minutes. Oh, thank you, Your Honor. I appreciate it. It is not unusual for counsel in these arguments to parade horribles before you to try to persuade you as to the correctness of their position. As my colleague has done, he's suggesting that this will eviscerate the exception for adverse. And I'm not quite sure whether that's accurate or not, but I do want to point out that by not recognizing the innocent third-party exception to the adverse, you will open the Pandora's box to counsel for the defendants to always argue that there was some self-interest involved by the corporate malfeasors in any misconduct. But he says the problem is really the opposite, that every time you have one of these cases, it's rare that the purchasers aren't innocent. Well, the only time they're not innocent, and this goes back to the Supreme Court, the PLCRA, reliance. In fact, the question is good-faith reliance. And, in fact, if you had inside information or if you weren't betting on the company, you were betting on some esoteric thing, then you would not have the opportunity to do that. And that's bedrock now, and that's Halliburton. We just went through that with the Supreme Court. So it's not immutable that you have a free pass. You have to prove good-faith reliance through various mechanisms. But it does make sense that one should be able to assume that a corporate head is acting with integrity. And, in fact, that's going to be a major issue in the Petrobras case, obviously, which we are highly involved in. Let me ask you, do you believe we need the adverse interest rule? Excuse me? Do you believe we need the adverse interest rule? I'm not sure that I—I will respect the fact that the ALI has, in 503, has the, as I understand it, an adverse interest rule with the imputation, and that that's longstanding. I don't know. I think in the context of securities cases, it may be very unuseful, if not should be discarded. But I don't know. I haven't thought through the entire consequences. All I know is that— Do you think you leave anything of the adverse interest rule if we rule for you? Will I leave—I'm sorry? Will anything be left of the adverse interest rule? Will there ever be a case in which stockholders or persons who've acquired stock will not prevail? Well, they will only—they will—it's not that they will prevail. It's simply that a defense will be removed from the corporation's arsenal. It will no longer be able to say that they are a victim of their agent's misconduct. Well, that's the same as eliminating the adverse interest rule. In the context of the securities laws, I can't disagree with you. But I haven't thought through the full consequences of that, so I'm hesitant to make— unless I knew what you were all going to come out with, I'm hesitant to make the concession. What I will say, though, is that there's never a time where a corporate officer isn't interested in cooking the books because it will, when that misconduct happens, because it will insure his job. He's meeting performance goals. It will insure his stock options. There's no question that the worst frauds that happened in the last decade were Enron, WorldCom. There was no question—there was no suggestion that, well, those leaders were looting the company while they were lying to the investors and that that somehow should have created a different standard. Again, the one case, Tyco, which was conceded. There was looting and lying going on. Again, it was not an appropriate objection to or defense in that circumstance. So in many respects, there may be an absolute—some point where there is a bright line to be drawn. I haven't fully considered it, but I am tending to agree with Your Honor that it does not apply— it should not be applied—the adverse exception should not be applied to the securities fraud area. Thank you, Your Honors. Thank you, counsel.
judges: Reinhardt, McKeown, Smith